**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL ACTION NO. 22-CR-00136-DCR**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**            **UNITED STATES' RESPONSE TO DEFENDANT'S**
                  **MOTION TO DISMISS INDICTMENT**

**SHERMAN KELVIN COMBS**                                    **DEFENDANT**

\* \* \* \* \*

The United States, through the undersigned Assistant United States Attorney,

respectfully requests the Court to deny the Defendant's Motion to Dismiss the Indictment

(DE 23) as 18 U.S.C. § 922(g)(8)'s prohibition does not fall under the plain text of the

Second Amendment and is consistent with an analogous tradition of firearm restrictions

in America. Further, making a false statement in the acquisition of a firearm in violation

of 18 U.S.C. § 922(a)(6) is not dependent on the constitutionality of 18 U.S.C. §

922(g)(8) or the illegality of the Defendant's possession of a firearm. The Defendant's

motion should be denied. In support, the United States provides the following:

**BACKGROUND**

On November 3, 2022, the Defendant, Sherman Kelvin Combs, was charged in an

Indictment (DE # 1) with one count of being a prohibited person in possession of a

firearm in violation of 18 U.S.C. § 922(g)(8) and one count of making a false statement

1

in the acquisition of a firearm in violation of 18 U.S.C. § 922(a)(6). The basis of the Defendant's prohibition under 18 U.S.C. § 922(g)(8) is that he was subject to a domestic violence order at the time of the offense. Additionally, the Defendant is alleged to have acquired the firearm in question by falsely stating that he was not subject to a domestic violence order at the time of the purchase from a federally licensed firearms dealer.

On January 6, 2023, the Defendant filed a motion to dismiss the Indictment relying on the United States Supreme Court's decision in <u>New York State Rifle and Pistol Association v. Bruen</u>, 152 S.Ct. 2111 (2022) and arguing that § 922(g)(8) "is unconstitutional on its face." (DE # 23-1 at 1). The Defendant further argues that the unconstitutionality of § 922(g)(8) renders the Defendant's false statement regarding the domestic violence order during the sale and acquisition of the firearm "immaterial." <u>Id</u>.

## **PROCEDURE**

Federal Rule of Criminal Procedure 12(b)(1) allows a defendant, through pretrial motion, to challenge an indictment based on "any defense, objection, or request that the court can determine without a trial on the merits." A district court may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as its conclusions do not invade the province of the ultimate finder of fact. *United States v. Ali*, 557 F. 3d 715, 719 (6th Cir. 2009)(internal citations omitted). Further, a pretrial motion to dismiss can be determined by a district court when the "trial of facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." <u>United States v. Covington</u>, 395 U.S. 57, 60

(1969). Because the Defendant challenges § 922(g)(8) "on its face" (see DE # 23-1 at 1, 2, and 7), the United States submits that the Court may resolve the issue as a matter of law through the Defendant's pretrial motion.

## ARGUMENT

### I.   Section 922(g)(8) is Constitutional Post-<u>Bruen</u>

In <u>New York State Rifle and Pistol Association v. Bruen</u>, 152 S.Ct. 2111 (2022), the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." <u>Id</u>. at 2126. The Supreme Court clarified that when a defendant's conduct does fall within the Second Amendment's plain text, the government must then show that "the regulation is consistent with this Nation's historical tradition of firearm regulation." <u>Id</u>.

The plain language of the Second Amendment states that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Supreme Court limited the Second Amendment to "law-abiding, responsible citizens." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008). "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Id</u>. at 626. <u>Heller</u> made clear that "nothing in [its] opinion should be taken to case doubt" on certain "presumptively lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of

3

firearms in sensitive places," and "law imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27 and n.26.

This limitation was confirmed repeatedly by the Supreme Court in Bruen. *See, e.g.*, Bruen, 142 S. Ct. at 2122 (stating that Heller "recognized that the Second and Fourteenth Amendments protect the right of an *ordinary, law-abiding citizen* to possess a handgun in the home for self-defense"); Id. at 2131 (quoting Heller's statement that the Second Amendment protects "'the right of *law-abiding, responsible citizens* to use arms' for self-defense"); Id. at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a *law-abiding citizen*'s right to armed self-defense"); Id. at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms"); see also Range v. Att'y Gen. United States, 53 F.4th 262, at 271 (3d Cir. 2022) (noting that "the [Bruen] majority characterized the holders of Second Amendment rights as *'law-abiding' citizens* no fewer than four-teen times") (emphases added). As further emphasized by Justice Kavanaugh in his concurrence, ""[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." Bruen at 2162 (Kavanaugh, J., concurring) (quoting Heller at 636).

"In some cases," the inquiry into "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" will "be fairly straightforward." Bruen at 2131. However, Bruen did recognize that even if a defendant's conduct does fall within the plain text,  the application of the historical

4

understanding may not be as straightforward as "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." Id. at 2132. Therefore, the historical inquiry will "often involve reasoning by analogy." Id. This "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. at 2133. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id.

### A. Section 922(g)(8) Does Not Implicate the Second Amendment Rights of "Law-Abiding, Responsible Citizens"

In Bruen, the Supreme Court reviewed a New York state law that required individuals to demonstrate "proper cause" to obtain a license to carry a handgun outside the home. Bruen, 142 S.Ct. at 2123. The Supreme Court found New York's licensing scheme unconstitutional as it "prevent[ed] law-abiding citizens with ordinary self defense needs from exercising their right to keep and bear arms." Id. at 2156. While the Supreme Court invalidated New York's "may issue" licensing regime, it approved of "shall issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course." Id. at 2138, n.9; see id. at 2162 (Kavanaugh, J., joined by Robert, C.J. concurring). In approving these types of licensing regimes, the Supreme Court noted that "shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" Id. quoting Heller.

"Shall-issue" regimes require authorities to issue concealed-carry license whenever applicants satisfy certain threshold requirements. Id. at 2123. Several of the 43 "shall-issue" licensing regimes identified by the Supreme Court specifically excluded from eligibility applicants who are subject to protective orders generally. See e.g., Tex. Gov't Code § 411.172(a)(12) and Va. Code Ann. § 18.2-308.09(5). These types of "shall-issue" regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." Bruen at 2162 (Kavanaugh, J., concurring). By affirming the practicing procedures of these "shall-issue" licensing regimes, which include limitations to those subject to protective orders, Bruen indicates that the right to bear arms does not extend to persons subject to such protective orders.

Persons subject to domestic violence protective orders satisfying § 922(g)(8) are not law-abiding, responsible citizens who fall under the Second Amendment's protections. A reading of § 922(g)(8) shows that the statute applies only to those who have been judicially determined, "after a hearing of which such person received actual notice, and at which such person had an opportunity to participate" to present a "credible threat" or "real threat" to the physical safety of an intimate partner or child. It further prohibits those individuals subject to an order that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." 18 U.S.C §

6

922(g)(8)(C)(ii). A person subject to a domestic violence order, where such judicial findings have been made, cannot be considered a "law-abiding" citizen much less "responsible." Thus, the Defendant cannot succeed on his claim that the Second Amendment applies to persons subject to domestic violence protective orders.

**B. Section 922(g)(8)'s Prohibition is Consistent with the Historical Tradition of Firearms Regulation**

Historically, the Second Amendment's right to keep and bear arms did not extend to persons who posed a danger to the state or community. For example, "the act of 'going armed to terrify the King's subjects' was 'a great offense at the common law,'" so long as it was committed with "evil intent of malice.'" Bruen, 142 S.Ct. at 2141. Likewise, in the late-18th century and early-19th century, American states enacted laws that "prohibit[ed] bearing arms in a way that spreads fear or terror among the people." Id. at 2144-2145 (internal quotations omitted). As Bruen observed, such statutes "all but codified the existing common law in this regard." Id. at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively in a threatening manner and authorized the arrest of those who did. See 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England, 1; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-32 (1821)

(1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute). "[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). "[D]angerousness was one reason to restrict firearm possession, but it hardly was the only one." Folajtar v. Attorney General of the United States, 980 F.3d 897, 909 (3rd Cir. 2020). "What concerned the Framers was that 'virtuous citizens' retain the right to bear arms; they had no interest in extending the same guarantees to those who act counter to society's welfare." Id. (internal citations omitted).

The Second Amendment was therefore adopted against a historical backdrop that allowed disarming dangerous persons. In what Heller called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts ratifying convention recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Kanter, 919 F.3d at 454 (Barrett, J., dissenting) (quoting 2 Schwarz, The Bill of Rights 675, 681). These "Second Amendment precursors proposed

in the state conventions," Heller, 554 U.S. at 603, reflected the well-established common-law principle that dangerous people could be disarmed.

Prior to Bruen, the Eighth Circuit explained that § 922(g)(8)'s prohibition is "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." United States v. Bena, 664 F.3d 1180, 1184 (8th Cir. 2011). Section 922(g)(8) "is focused on a threat presented by a specific category of presumptively dangerous individuals" and does not "apply in perpetuity, but only so long as a person is 'subject to' a qualifying court order." Id. Therefore, "the Second Amendment does not preclude this type of regulatory measure." Id.

An analysis under Bruen confirms that the Eighth Circuit was correct. Bruen explained that "two metrics" are "central" in asking whether a modern regulation is "relevantly similar" to an asserted historical analogue: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and (2) "whether that burden is comparably justified." Bruen at 2132-33. Here, both metrics demonstrate § 922(g)(8)'s constitutionality.

Under the first metric, the question is "how . . . the regulations burden a law-abiding citizen's right to armed self-defense." Bruen at 2133. In most (if not all) cases, § 922(g)(8) imposes no burden on a "law-abiding citizen's right" because the conduct leading to the protective order ordinarily violates the law. But even as to non-law-abiding individuals, § 922(g)(8) poses a limited burden, applying only as long as the person is "subject to" the protective order. 18 U.S.C. § 922(g)(8). It is not a lifetime ban. In this

9

regard, it is similar to historical statutes requiring an oath of allegiance for those deemed a threat to the political order or temporarily disarming those who terrorized the community.

As to the second metric, "why the regulation[ ]" exists, the historical and statistical data indicate that the burdens imposed by § 922(g)(8) and by historical laws are "comparably justified." Bruen at 2133. Between 1980 and 2008, 41.5% of female homicide victims in the United States were killed by their intimate partners (defined as spouse, ex-spouse, or boyfriend/girlfriend). Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, 10 (November 2011) (Table 6), available at https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf (permalink: https://perma.cc/V4ES-QVM4). "Domestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." United States v. Castleman, 572 U.S. 157, 160 (2014) (citation omitted). In fact, studies have indicated that, where a gun is in the house, a woman is six times more likely to be killed than other abused women. Id. (citing Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, Nat'l Inst. Of Justice J., No. 250 at 16 (Nov. 2003)). Thus, there are strong reasons to disarm those who have been judicially determined to pose a threat to their intimate partners' safety. These justifications are just as strong as those supporting the historical prohibitions on firearm possession by those who posed a threat to the community or to specific individuals. See e.g. United States v. Kays, No. 22-CR-40-D, 2022 WL 3718519, at 3-4 (W.D. Okla. August 29, 2022) (finding that "domestic violence

10

misdemeanants can logically be viewed as relevantly similar to felons who should be denied weapons for the same reasons" and that "[t]hose subject to a domestic violence protective order should logically be denied weapons for the same reasons" as domestic violence misdemeanants) (internal quotations and citations omitted). Thus, under Bruen's historical analogue test, § 922(g)(8) is constitutional.

### C.  Section 922(g)(8) is Analogous to Historical Surety Laws

In addition to the laws discussed above, historical surety laws provide another analogue that demonstrates § 922(g)(8)'s constitutionality. At a basic level, surety laws impose protections, sometimes including a restriction on firearm possession, where a person was reasonably likely to injure another or to breach the peace. See Bruen, 142 S. Ct. at 2148.

In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." Young v. Hawaii, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), vacated 2022 WL 2347578 (U.S. June 30, 2022). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; . . . he may demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769). The surety was "either a money payment or pledge by others 'in support of his future good conduct.'" Young, 992 F.3d at 791 n.12 (quoting David Feldman, The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers, 47 Cambridge L.J.

101, 104 (1988)). And if the person against whom the accusation was made did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." 4 Blackstone at 252. The surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen." Id. at 249.

This common-law surety practice carried over to the American colonies. For example, under a 1759 New Hampshire Act, a justice of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches." Acts and Laws of His Majesty's Province of New Hampshire in New England 1 (1759). And upon "confession" or "legal proof" of the offense, the justice could "commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required" and could "cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." Id. at 1-2; see 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52- 53 (1869) (a similarly worded 1692 statute in the Massachusetts Bay Colony).

In 1829, before the passage of the surety statutes described below, William Rawle explained that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and that "[i]f

he refused he would be liable to imprisonment." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829). And various cases from shortly after the adoption of the Second Amendment confirm that the common-law surety practice continued in the United States. See, e.g., Republica v. Donagan, 2 Yeates 437, 437-38 (Pa. 1799) (surety could be demanded of defendants acquitted of murder); State v. Kershaw, 1 Del. Cas. 218, 219 (Del. Ct. of Quarter Sessions 1799) (surety could be obtained based on "apprehension of danger" without proof of threats).

"In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." Bruen, 142 S. Ct. at 2148; see Heller, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" as a means of determining "the public understanding" of the Amendment (emphasis omitted)). Massachusetts was the first state to adopt such a statute in 1836. Bruen, 142 S. Ct. at 2148. Under the Massachusetts statute, if any person was armed and could not show a special need for self-defense, he could "on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law." Bruen, at 2148.

There are, to be sure, some differences between § 922(g)(8) and the English and early American surety laws. Most notably, the nineteenth-century laws "did not prohibit

13

public carry" so long as the bearer "posted money that would be forfeited if he breached the peace or injured others" Bruen, at 2148 (brackets and quotations omitted). But, like the laws discussed above, the surety laws subjected a person to possible disarmament and prison based on his presenting a credible threat of violence to a specific person. In that way, the surety laws are analogous to § 922(g)(8). Like the prohibition in § 922(g)(8), which lasts only while a person is "subject to" a restraining order, the surety laws' restrictions lasted only for a specified time. See 4 Blackstone 249-50. And, in fact, § 922(g)(8) has more procedural safeguards than the surety laws. A person could be required to provide a surety based on another's oath alone, 4 Blackstone 252, whereas § 922(g)(8) requires a court to find a "credible threat to the physical safety" of an intimate partner or child.

Additionally, Bruen emphasized that the historical test that it adopted "requires only that the government identify a well-established and representative historical analogue, not a historical twin." Bruen at 2133. Although not identical to the surety laws, § 922(g)(8) is "analogous enough to pass constitutional muster." Id.

**D. The Recency of Section 922 and Protective Order Statutes is not Controlling**

In Bruen, the Supreme Court stated that where a modern regulation addresses "a general societal problem that has persisted since the 18th century," "the lack of a distinctly similar historical regulation"—or the existence of a historical regulation that addressed the problem "through materially different means"— could be "relevant evidence" that the statute is unconstitutional. Bruen, 142 S. Ct. at 2131. But Bruen did

14

not suggest that a statute is unconstitutional simply because it involves a new way to address longstanding concerns. As <u>Bruen</u> recognized, some modern statutes implicate "unprecedented societal concerns," and some modern regulations "were unimaginable at the founding." <u>Id</u>. at 2132. Yet those statutes are constitutional if supported by an appropriate "historical analogue." <u>Id</u>. at 2133 (emphasis omitted). <u>Bruen</u> gave the example of historical laws prohibiting the carrying of firearms in "sensitive places" and said that "courts can use analogies to those historical regulations. . . to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." <u>Id</u>. Thus, <u>Bruen</u> does not suggest that a statute is unconstitutional just because it targets a longstanding societal problem in a new way.

The fact that protective orders as means of preventing domestic violence are a relatively recent invention does not mean that § 922(g)(8) is unconstitutional.[1] In fact, the history shows that other protections—most notably the common-law surety process described above—were long available to protect victims of domestic violence in much the same way as modern protective orders.

---

[1] See <u>United States v. Kelly</u>, No. 22-CR-00037, 2022 WL 17336578 (M.D. Tenn. November 16, 2022), questioning, in the context of § 922(g)(8), whether "the absence" from the historical record "actually reflects historical attitudes regarding firearm regulation, or is it a feature of historical attitudes regarding the role of the state in policing violence between intimate partners" and whether "the change is in how we think of domestic violence, not in how we think of firearms *per se*."

## II.   Comb's § 922(g)(8) Unconstitutionality Claim is Irrelevant to the Violation of 18 U.S.C. § 922(a)(6).

The Defendant requests dismissal of Count 2 of the Indictment charging him with violating 18 U.S.C. § 922(a)(6), making a false statement in the acquisition of a firearm. The Defendant argues that the unconstitutionality of 18 U.S.C. § 922(g)(8) renders any false statement concerning the domestic violence immaterial, and, therefore, he has not committed a violation of 18 U.S.C. § 922(a)(6). DE # 23-1 at 7. Regardless of § 922(g)(8)'s constitutional question posed by the Defendant, it does not change the undisputed fact that the Defendant was, at the time of his acquisition of the firearm, subject to an eligible domestic violence order. Nor does the constitutional question change the falsehood of that statement during the Defendant's acquisition.

In enacting § 922(a)(6), "Congress intended to provide a scheme of regulation by compelling full and honest disclosure." Cassity v. United States, 521 F.2d 1320, 1323 (6th Cir. 1975). Sections 922(g)(8) and 922(a)(6) penalize two different aspects of the Defendant's conduct. While § 922(g)(8) prohibits the Defendant's possession of the firearm after it is acquired, § 922(a)(6) penalizes the Defendant's falsehood prior to obtaining the firearm from a licensed dealer. "[Section 922(a)(6)] penalizes [the Defendant] not for being [subject to a domestic violence order] but for failing to tell the truth about the [order]." Id.

16

**A. The Defendant's Argument Regarding an 18 U.S.C. § 922(a)(6) Charge is Foreclosed by the Constitutionality of 18 U.S.C. § 922(a)(6).**

The Defendant's argument as to Count 2, charging a violation of 18 U.S.C. § 922(a)(6), is foreclosed by the above-analysis concerning a charge under 18 U.S.C. § 922(g)(8). It is undisputed that the Defendant was subject to a domestic violence order at the time of his acquisition of the firearm and provided false information as to his status during the purchase of the firearm. Because § 922(g)(8) is constitutional, the Defendant's motion to dismiss Count 2 should be denied.

**B. Section 922(a)(6)'s Materiality Element is Not Dependent on the Criminality of the Defendant's Possession of a Firearm.**

The Defendant incorrectly assumes that materiality of a false statement is dependent on the criminal nature of the underlying fact. The Defendant asserts that if the prohibition to possess firearms based on his specific status is unconstitutional, then his subsequent possession of a firearm is not criminal. Therefore, under the Defendant's theory, falsifying that status in acquiring the firearm cannot be a violation of § 922(a)(6). See DE # 23-1 at 7. However, § 922(a)(6) applies to any material false statement even if the veracity of the falsehood would not prohibit a person's possession of a firearm. See e.g. Abramski v. United States, 573 U.S. 169, 189-190 (2014) (misrepresenting identity of buyer or using alias would still be material and a violation of § 922(a)(6) even if the buyer in either instance was not prohibited and could legally possess a firearm); United States v. Morales, 687 F.3d 697, 701 (6th Cir. 2012) (misrepresenting identity of buyer

was still material to the sale even if the actual buyer was eligible to purchase firearm themselves).

Likewise, a defendant's subjective belief as to the validity of a domestic violence order does not take him outside the requirements of § 922(a)(6). "[N]othing in the language of 18 U.S.C. § 922(g)(8) indicates that it applies only to persons subject to a *valid*, as opposed to an *invalid*, protective order." United States v. Hicks, 389 F.3d 514, 535 (5th Cir. 2004) (emphasis included). "Regardless of how [the Defendant] became subject to a domestic violence order, he attained that status and thus must comply with § 922(g)(8)." United States v. Baker, 197 F.3d211, 217 (6th Cir. 1999). Against this backdrop, at least one district court recently found that this same reasoning applied to § 922(a)(6) charges, determining that "[t]he pertinent question is whether [a defendant] knowingly made a false statement as to whether he was subject to <u>any</u> court protection order, not whether he believed he was subject to a <u>valid</u> court protection order." United States v. Thomas, No. 3:20-CR-634, 2022 WL 1803339 (N.D. Ohio, June 2, 2022) (emphasis included).

The constitutional question, too, is irrelevant to an offense under § 922(a)(6). Congress did not intend to entitle "a prospective purchaser of a firearm under [§ 922(a)(6)]…to conceal the fact of a prior conviction, even if a claim of constitutional invalidity is subsequently established." Cassity, 521 F.2d at 1323. The Defendant's constitutional argument is analogous to one made in United States v. Enyinnaya, 774 F.2d 1164 (6th Cir. 1985) (unpublished) where a defendant argued that a Tennessee

18

statute prohibiting the sale of firearms to aliens was unconstitutional in a straw

purchasing case. The Sixth Circuit determined that "the constitutionality vel non of the

Tennessee law has no bearing on the § 922[(a)(6)] violation." <u>Id</u>. The defendant's

"motive or alleged reason for violating the statute, the claimed unconstitutionality of the

Tennessee statute, is not a legal excuse for the violation" as "[t]he violation was

completed when" the "false information" was "filled out [on] the ATF form." <u>Id</u>. This

violation is independent of the Defendant's ability to possess a firearm.

### C. Section 922(a)(6) Does Not Prohibit the Possession of a Firearm.

Section 922(a)(6), itself, does not prohibit the possession of a firearm. It only

prohibits a purchaser from deceiving a licensed dealer in acquiring the firearm. "[Section

922(a)(6)] does not prohibit possession of a firearm at all; it merely asks that a person

seeking to purchase a firearm not lie in the process of doing so." <u>United States v. Conrad</u>,

923 F.Supp.2d 843, 852 (W.D. Va. 2013). The United States Supreme Court has

indicated its approval of such regulation imposed by § 922(a)(6) stating that <u>Heller</u> made

clear that "longstanding regulatory measures" such as "laws imposing conditions and

qualifications on the commercial sale of arms" were constitutional. <u>McDonald v. City of</u>

<u>Chicago, Ill.</u>, 561 U.S. 742, 786 (2010) (internal quotations omitted).

As previously discussed, <u>Bruen</u> did not disturb the "shall issue" licensing regimes

in multiple states. As emphasized by Justice Kavanaugh's concurrence, states can

constitutionally require applicants to "undergo fingerprinting, a background check, a

mental health records check, and training in firearms handling and in laws regarding the

use of force, among other possible requirements." <u>Bruen</u>, 152 .Ct. at 2162. If such identified administrative burdens on the acquisition of a firearm, such as background checks, are permissible, then requiring an individual to provide truthful information as part of that background check is also permissible.

### D. Section 922(a)(6) is Consistent with this Nation's Historical Tradition of Firearms Regulation.

The Defendant does not make any Second Amendment claim as to the § 922(a)(6) charge in Count 2. Further, the United States does not concede that the Defendant's objection to the § 922(a)(6) charge should be subject to any analysis under <u>Bruen</u> as the offense, on its face, does not prohibit individuals from possessing a firearm and does not implicate the Second Amendment. However, should the Court consider § 922(a)(6) under <u>Bruen's</u> historical tradition analysis, the Defendant's motion should still be denied.

"A wide range of gun regulations, including safe storage laws; time, place, and manner restrictions; and even prohibitions on certain classes of weapons have deep roots in American history stretching back before the American Revolution and extending forward in time long after the Second Amendment was adopted." Saul Cornell & Nathan DeDino, <u>A Well Regulated Right: The Early American Origins of Gun Control</u>, 73 Fordham L. Rev. 487, 516 (2004). "[C]olonial governments substantially controlled the firearms trade." <u>Teixeira v. County of Alameda</u>, 873 F.3d 670, 685 (9th Cir. 2017). "The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers." <u>Id</u>.

Further, "colonial government regulation included some restrictions on the commercial sale of firearms" (Id.) as colonial governments implemented "[v]arious registration or taxation schemes…to address [] concern[s]" regarding "[a]rms and ammunition trafficking," Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 77 (2017). "For example, a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Id. "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also arms and munitions." Id. (internal quotations omitted). "Connecticut banned the sale of firearms by its residents outside the colony." Teixeira at 685. Virginia colonial law allowed persons to sell firearms to "any of his majesties loyal subjects inhabiting" the Virginia colony but did not extend the sales to others. Id. at 685 n.18. In other words, these laws "did not encompass a freestanding right to sell arms, independent of citizens' right to acquire them." Id.

Section 922(a)(6) is analogous to historical regulations concerning firearm sales, independent of one's individual right to possess firearms. As such, the fact that a person would not be prohibited from possessing a firearm under the Defendant's constitutional theory regarding § 922(g)(8) statuses, does not mean that no violation can occur from falsifying information required during a commercial firearms transaction prescribed by Congress.

## CONCLUSION

Under <u>Bruen</u>, Section 922(g)(8) remains constitutional. The conduct it prohibits—possessing a firearm by an individual subject to an active protective order—does not fall within the Second Amendment's plain text. Additionally, the prohibition is consistent with an analogous tradition of firearm restrictions in America. Furthermore, the constitutionality of whether the Defendant was prohibited from possessing a firearm is irrelevant to falsely concealing his status during the acquisition of a firearm under § 922(a)(6). The United States therefore respectfully requests that the Court deny Defendant's motion to dismiss the Indictment.

## NOTICE REGARDING ABBREVIATED OBJECTION PERIOD

Pursuant to the Court's Order (DE # 24), the United States does not object to an abbreviated objection period of five days upon submission of the Report and Recommendation.

Respectfully Submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   /s/ Francisco J. Villalobos II
        Assistant United States Attorney
        260 West Vine Street, Suite 300
        Lexington, KY 40507
        (859) 685-4847
        (859) 233-2747 FAX

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2023, I electronically filed this document with the clerk of the court through the CM/ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ Francisco J. Villalobos II
Assistant United States Attorney
260 West Vine Street, Suite 300
Lexington, KY 40507
(859) 685-4847
(859) 233-2747 FAX